GAYNOR and others v. THE GLER and Cargo.

(*District Court, S. D. Georgia, E. D.*  1887.)

SALVAGE—SERVICES—BURNING VESSEL.
Where a tug provided with a steam pump for extinguishing fire is first to reach a burning vessel and pumps water in the hold for five hours, and the fire is finally extinguished by flooding, the tug is entitled to salvage, although larger pumps and the city fire engines rendered greater service.

(*Syllabus by the Court.*)

In Admiralty. Libel *in rem.*  Salvage.
*J. J. Abrams*, for libelant.
*George A. Mercer* and *A. Mimis, Jr.*, for complainant.

SPEER, J. On the eighth day of December, 1886, the Norwegian bark Gler was lying at her wharf in Savannah loading with her cargo of cotton. A large portion of the cargo had already been loaded, amounting in value to about $43,000. The forward part of the hold had been thoroughly stowed and the cotton packed. At 6 o'clock in the afternoon a fire broke out in that portion of the cargo; the alarm was instantly given, and the tug William C. Turner, belonging to the libelants, which at that moment was about to make fast to her wharf 100 feet from the bark, cast off, backed down opposite the bark, there being a lighter or flat 20 feet wide intervening, and making fast the hose to her pump, the crew at once carried the hose on board the bark and very soon thereafter began to play upon the fire, and to throw water down in the hold of the vessel. The tug continued to pump without intermission, first into the after-hatchway (the booby hatch) and then into the main hatchway, for about 5 hours at the rate of 75 gallons a minute. At the time that the tug began to pump water on the fire, the fire department of Savannah reached the Gler, and thenceforward played five large streams, each amounting according to the testimony to about 350 gallons a minute, and the tug Republic played four streams of the same size and for nearly as long. After a while, finding that the fire was not subdued, the mate in charge of the bark ordered her to be scuttled. Holes were bored by the carpenter one inch and a half thick on the water-line, and she began then to fill very rapidly, and the water soon covered a large part of the cargo, but as yet the fire was not extinguished, and it swept up toward the starboard bulwarks, and the firemen cut away the deck in order to reach it. After it was extinguished (which was not until the cargo had been entirely flooded) and after she was pumped out, it was found that the entire ceiling of the hold was very badly charred; that the foremast was scorched, and that very considerable damage had been done to the vessel and cargo.

The tug brings her libel for salvage and it is resisted on the ground that she rendered no appreciable service in the extinguishment of the fire. It is not probable that the tug did render any very great service. What she did render was meritorious, and was done with a very good

will. Her crew was the first to come to the assistance of the distressed bark, and from the moment that she was permitted to do so she pumped with all the power at her disposal upon the fire. The testimony is that she was well rigged for the purpose of extinguishing fires of this character. She had a good pump, which had been recently overhauled, with 70 feet of hose, and she worked so hard during these five hours that she loosened some of her machinery and only stopped a moment for the purpose of tightening the bolts she had worked loose in the great speed with which the engine was running in throwing water down in the hold of the burning bark.

I think it is very evident that the services rendered by the tug were salvage services, but without any very great risk or labor employed in effecting them, but nevertheless an allowance for them will properly exceed a mere remuneration *pro opere et labore.* Chief Justice MARSHALL, in *The Blaireau,* 2 Cranch, 264, announces:

"The allowance of a very ample compensation for those services (one very much exceeding the mere risk encountered and labor employed in effecting them) is intended as an inducement to render them, which it is for the public interests and for the general interests of humanity, to hold forth. It is perhaps difficult, on any other principle, to account satisfactorily for the very great difference which is made between the retribution allowed for services at sea and on land; neither will a fair calculation of the real hazard or labor be a foundation for such a difference, nor will the benefit received always account for it."

"Salvage is not a payment for mere work and labor; other considerations are to be regarded. The general interest of navigation and the commerce of the country is to encourage exertion and to compensate risk and energy. It is true, on the other hand, that the court must guard against exorbitant demands and undue advantage being taken of the distressed, but where the salvors act honestly and fairly they are to be liberally rewarded." *The Hector,* 3 Hagg. 95. Certainly this was honest service; there was no higgling about it. The engineer sprang aboard the bark with the hose as soon as he could, and cried, "Here is water; where do you want it?" and the crew worked very earnestly. Now such prompt and willing service as this must not be discouraged by the courts in the harbor of Savannah, or elsewhere. It must be encouraged. These tugs, rigged in this way for the purpose of extinguishing fire, are just as important for the shipping interests as the fire engines are to the city. They contribute as much in saving losses to the people and to insurance companies as do the fire-engines, and it is a part of the policy of the law to encourage those in charge of them.

While it is not clear to my mind that the stream from the pump of the tug extinguished the fire, it contributed its full powers to that result. The fire was put out by no special skill on the part of the fire department, but simply by the volume of water pumped into the hold. Certainly the tug was pumping in water all the time. It was an obstinate, dangerous fire, and while the fire department might finally have extinguished it, had not the tug been there, by the great volume of water

rapidly poured in, yet it is probable that it would have been extinguished after greater loss on the cargo and greater injury to the vessel. In this case I think the sum of $250 is a proper allowance for salvage, for the firemen. It is to be divided as follows: The master $25; the engineer $25; the assistant engineer $20; the deck-hand $10; the cook $10; and the rest to go to the owners of the tug.

I find that the defendant shall pay the cost, and that the sum named shall be divided and apportioned between the cargo and the vessel in this proportion; that the cargo shall pay two-thirds, and the vessel one-third. I know that this is not in accordance with the proven value of the property saved, but I also feel that it is a fair presumption that this fire was occasioned by the negligence of the crew of the vessel, and for that reason it is held by the court that they shall pay a larger share than they would be held liable to pay if it was adjusted on the basis of $2,800, for which the vessel was sold. I would also include the freight in this assessment if there had been any allegations or proof which would enable me to do so.

Let the decree be framed accordingly.